Bergan, J. (dissenting).
The effect of the identification in a police station of an accused by a victim of a robbery without a differential lineup is to be determined as a question of due process.
The issue is basically concerned with the reliability of the victim’s identification of the accused at trial. Chief Judge Fuld laid the rule down in People v. Ballott (20 N Y 2d 600). The question is whether the “ pretrial identification procedure ” has been “ so unfair as to amount to a denial of due process of law” (pp. 605, 606).
Judge Breitel put it with slightly different emphasis in People v. Logan (25 N Y 2d 184, 191) to say that the question is whether the pretrial identification is “so unnecessarily suggestive ’ ’ and whether it is so “ conducive to an erroneous identification ” as to rise to the level of a deprivation of due process.
Not by any of these criteria, or by those laid down by the Supreme Court (e.g., Simmons v. United States, 390 U. S. 377), *420 should the court hold in this case that the identification without a lineup of defendant by the victim amounted to deprivation of due process; or that the police station identification had any real effect on the reliability of her testimony against defendant on the trial.
Identification without a lineup can be both unfair and suggestive ; but it also may have no prompting effect whatever on the witnesses ’ trial identification. It ought not be taken in isolation. Whether it is unfair or not in the sense it plays a significant role in the trial testimony of the witness depends on occurrences before the identification which may throw light on whether there has been an ‘1 erroneous identification ’ ’ (People v. Logan, supra), or whether the ability of the witness to identify defendant on the trial had an “ independent source ” (Gilbert v. California, 388 U. S. 263, 272).
An ‘ ‘ independent source ’ ’ can mean nothing other than that the witness is able to make the identification at the trial, drawing on his own memory, not affected by the promptings or suggestions of what he saw at the police showup.
If it can in fairness be seen that the witness is able to make a reliable identification without dependence on what was seen at the police station, the fact there has been a showup ought not automatically lead the court to reverse for an absence of due process.
The record in this present case strongly suggests the independent reliability ,of the victim’s trial identification of defendant. Her testimony of identification on the trial was positive and unequivocal. It withstood an exhaustive cross-examination.
The defendant was in the presence of the victim at the time of the crime for about a half hour. During a substantial part of this time and especially when he was attacking the victim his face was completely uncovered. She observed him closely and described him accurately in her original report to the police.
Her complaint stated he had hair of a peculiar color and style; that he had a cut or burn on his arm; that his hands were covered by black socks. When she went to the police station before defendant’s arrest the police gave her “ a bin of random cards ” containing photographs of persons with criminal records, some 60 to 70 in number, and the police testified: “ She *421 pulled the picture out and identified him. She said, ‘ That’s the man. ’ ’ ’
It was on the basis of this particularization of identification that defendant was arrested. Police observations of defendant when apprehended jibed exactly with what the complainant had .told them before she looked at the pictures. Defendant did indeed have a cut or burn on his arm; he had the kind of hair the witness had described; and, what is highly suggestive of accuracy of identification, he had a pair of black socks in his pocket.
The victim could scarcely have invented the wearing of socks on the hands — a bizarre circumstance—nor would the police have been likely-to suppose defendant would be carrying the socks around in his pocket, an almost equally bizarre circumstance.
Seen in the context of events which preceded it, the lineup identification does not itself open victim’s identification to any reasonable doubt. It is not greatly different from the situation which would obtain if a victim gave police very precise descriptive information about an accused, then saw him on the street, called the police who shortly captured him, and then identified the offender after arrest. Not to permit that victim to testify because such a showup 1 ‘ tainted ’ ’ the reliability of his identification would adversely affect a substantial measure of routine police inquiry and identification. The present case should be governed by the same principle.
It is not difficult to demonstrate that the cases both in the Supreme Court and in this court which have treated showup identifications as a deprivation of due process on the basis of essential unfairness do not have, and should not have, application to this present case.
An illustration of the kind of suggestive identification which has been deemed unfair and hence a constitutional deprivation is Foster v. California (394 U. S. 440). There the defendant, a tall man, was placed in a lineup with two short men. The victim could not positively identify defendant. He asked to speak to defendant and was allowed to do so alone with only prosecuting officers present.
*422 The victim was still uncertain. Some days later there was a second lineup in which there were five men, but defendant was the only one who had been in the first lineup. The witness was then “convinced ” defendant was the right man (pp. 441, 442).
The decisive factor in Foster was the conclusion that the court was able to make that the “ suggestive elements ” in the identification procedure “ made it all but inevitable ” that the victim ‘ ‘ would identify petitioner whether or not he was in fact ‘ the man ’ ” (per Fobtas, J., p. 443). The opinion concluded: “ This procedure so undermined the reliability of the eyewitness identification as to violate due process.” Such conclusions could not be reached on the present record.
In United States v. Wade (388 U. S. 218), involving a lineup, not a showup, the question was whether, after the criminal action had been commenced by indictment and counsel had appeared, the lineup deprived the accused of assistance of counsel; and a hearing was directed to determine whether, in view of this constitutional deprivation, the trial identification was based on “observations” of accused “ other than” the lineup identification.
The case is irrelevant here unless one assumes that the present procedures were so unfair as to amount to constitutional deprivation of a different kind. The decision in Gilbert v. California (388 U. S. 263, supra) turned essentially on the same issue, “ a lineup conducted without notice to his counsel ” (p. 269).
■ When we turn to Simmons v. United States (390 U. S. 377, supra), where the conviction of Simmons was upheld against an argument that the examination of photographs by witnesses was essentially unfair and tainted their in-court identification, we find a case somewhat closer in principle to the present case than those which have been examined.
Six group photographs were shown to the witnesses in a bank holdup. 'Simmons and one other robber (Andrews) appeared several times in the series. All five eyewitnesses identified Simmons from the photographs; none identified Andrews. As a matter of sheer suggestiveness, this kind of identification by photographs limited both in number and subject especially as to Simmons was certainly more “tainted” than that in this present case when the record is seen in totality.
*423 Nevertheless Justice Hablan, writing for the court, concluded, and this was decisive: ‘ ‘ These initial identifications were confirmed by all five witnesses in subsequent viewings of photographs and at trial, where each witness identified Simmons in person. Notwithstanding cross-examination, none of the witnesses displayed any doubt about their respective identifications of Simmons. Taken together, these circumstances leave little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some respects fallen short of the ideal ” (pp. 385-386).
Nor is this present case governed by People v. Ballott (20 N Y 2d 600, supra) in which there was an initial and obviously suggestive meeting of the witness with defendant in the police station. The witness identified him only after at her request he had donned a hat and heavy coat similar to that worn by the robber, and again at her request had uttered the words “give me the money, give me the envelope” (p. 603). She made her identification only after she heard him speak.
It is worth noting, too, that the procedure sustained in People v. Brown (20 N Y 2d 238) where, without prior identification of defendant by photographs or otherwise, the complainant was allowed to view him with only the codefendant, also a negro, and a white detective, through a small window in another room, was held harmless error.
There is in the present record no such initial demonstration of impairment of constitutionally protected due process rights as to require a pretrial evaluation by the Judge, or an on-trial evaluation by him without the jury, of the reliability of the complainant’s testimony. Thus the Judge’s view, right or wrong, that defendant had the burden on the question is quite immaterial.
Indeed, the new inquiry now proposed by the court “ to determine the independent value, and, therefore, the admissibility of” the complainant’s trial identification seems a peculiarly sterile exercise.
The complainant at the trial was subjected to a cross-examination in which her memory and the independence of her identification were thoroughly canvassed. It is not possible to foresee on what reasonable basis this Trial Judge, or any Judge, would exclude her testimony against defendant because of the *424 possible influence of her identification of defendant in the police station.
If the Trial Judge takes the direction of this court literally to determine the ‘ ‘ independent value ’ ’ of the identification, he will address himself to the operations of Mrs. Wright’s mind to see if she really remembered defendant, as she said she did, from her recall of the harrowing experience of the crime itself.
If she says again that she can remember the crime and identifies defendant, as she undoubtedly will, any alternative open to the Judge than to admit her testimony is not reasonably foreseeable.
An informed judicial choice on this inquiry must rest on objective occurrences in the record, e.g., the consistency of the original complaint and description with other facts; and those objective occurrences are as now fully developed as they are likely to be on a rehearing before the Judge.
If one leaves aside objective events and tries to probe' directly into the mental processes of witnesses, the field of inquiry becomes extremely tricky and uncertain. Judges are not accustomed to determining the internal effects on mind and memory of witnesses of one experience laid over another. We accept truth or falsity in bulk and largely leave the conclusions to juries.
To make a really informed judgment as to whether what Mrs. Wright saw in the police station had, or did not have, an effect on her earlier memory is a matter of marked delicacy and difficulty and probably not reliably determinable by what she .says about her own ability. Complicating such an inquiry in this case is her earlier identification of the photograph.
If objective facts so strongly show an undue influence in the showup that the Judge can say from normal human experience the identification lost independent value, a subject open to normal judicial determination may be present.
But the ability to say this confidently from objective facts would arise in an extremely rare case, such as Foster v. California (394 U. S. 440, supra). Even there the case went back to California to determine if the procedure was harmless error. This, of course, is a question determinable according to well-understood rules.
*425 But the remission to be ordered in the present case to determine the independent value of what a witness .says is quite a different kind -of inquiry. There is no suggestion of new facts relating either to crime or identification to be developed and essentially what the hearing judge must address himself to is the internal memory processes and the mental discipline of differentiation of Mrs. Wright—unlikely subjects.
It would be .remarkable if any Judge of this court, put to decision, would exclude Mrs. Wright’s testimony of the crime committed in this case on anything shown in this record or that will be shown on remand.
This kind of collated probing into reliability of witnesses may be required in extreme cases of police-suggested testimony, but it should not be .routinely directed merely because there is a showup. A growing amount of judicial time and court manpower, limited in availability, is devoted to side inquiry at a time when the prompt trial of the criminal charges themselves is impaired.
The widespread Huntley hearings of purported coerced confessions, while not notably productive, at least have the virtue of normal adversary inquiry into controverted objective facts. But nothing productive or useful can possibly emerge from the hearing now ordered by the court in this case.
Nor does the alternative ground of error considered by the court suggest reversal. Defendant took the stand and testified. He flatly denied the crime. He was not asked on his direct examination whether he had socks in his pocket when arrested or concerning his interrogation in the police station when the socks were found in his pocket.
But in this case the possession of socks had a direct relevancy to the crime itself and it was proper to cross-examine him as to the fact even if he remained aloof from it on direct examination. If a man with a green hat commits an assault, it seems proper to show on cross-examination that defendant when arrested wore a green hat; or in the case of a stolen watch had a watch in his possession similar to the stolen one.
The fact he chose not to refer to the subject while testifying to a denial of guilt ought not cut off cross-examination addressed to a fact directly bearing on the crime because at the *426 pertinent time defendant is under arrest. Nothing in People v. Wellington (26 N Y 2d 891, decided April 8, 1970) precludes this kind of inquiry.
But if it be assumed that the testimony of the police officer as to what defendant said when the socks were found in possession should not have been received, the error was harmless. The policeman testified he asked defendant why he had the socks. ‘1 [H]e told me that he just had them. He couldn’t give me a reason why he had them.”
But defendant’s cross-examination on the socks found on him when arrested, which, as it has been noted, was a proper subject of cross-examination directly related to the crime, took a strange and inconsistent pattern. Although he denied having the socks and denied a conversation with the police about them, at one point he testified “ I did not see those socks till the police station ”. At another he testified enigmatically “ I was speaking about the socks. I’m not denying that, that we .spoke about it and, elsewhere, “ I really didn’t think anything of—of a pair of socks
Moreover, defendant’s mother, called as a witness, testified on cross-examination in response to a proper question that her son carried socks in his pocket when he went visiting. When defendant’s attention was called to this testimony his explanation was in effect that it saved his mother trouble in washing to carry socks and other laundry in his pockets. In this kind of a context, the testimony of the policeman that defendant did not give a ‘ ‘ reason ’ ’ why he had the socks .seems of no significance. If this was error, it was harmless. The proof of defendant’s guilt on the whole record is overwhelming (People v. Miles, 23 N Y 2d 527).
The judgment should be affirmed.
Chief Judge Fuld and Judges Burke and Gibsox concur with Judge Breitel ; Judge Bergax dissents and votes to affirm in a separate opinion in which Judges Scileppi and Jasex concur.
Judgment reversed and case remitted to Supreme Court, Bronx County, for further proceedings in accordance with the opinion herein.